THOMAS EDWARD SCHLAFER, APPELLANT, *v.* THE STATE OF NEVADA, RESPONDENT.

No. 31028

June 16, 1999                                                979 P.2d 712

*Patti & Sgro* and *Bruce D. Clark,* Las Vegas, for Appellant.

---

*Frankie Sue Del Papa,* Attorney General, Carson City; *Stewart L. Bell,* District Attorney, and *James Tufteland,* Chief Deputy District Attorney, Clark County, for Respondent.

Before ROSE, C. J., AGOSTI and BECKER, JJ.

## OPINION

*Per Curiam:*

On the evening of January 13, 1994, appellant Thomas Edward Schlafer (Schlafer) stopped for a red light at the intersection of Rancho Drive and Highway U.S. 95 in Las Vegas. A red Ford Explorer, driven by Melynda Aulicino (Aulicino), stopped for the red light in the lane adjacent to Schlafer's. While waiting for the light to change, a verbal altercation erupted between Schlafer and

Aulicino during which Schlafer pulled a gun and shot Aulicino. Although severely wounded, Aulicino survived the attack.

Schlafer was apprehended shortly thereafter and charged with attempted murder with the use of a deadly weapon and battery with the use of a deadly weapon. At trial, Schlafer advanced a theory of self-defense, claiming that during their verbal altercation, it appeared that Aulicino was reaching for a gun. In refuting this claim, the State introduced testimonial evidence indicating that Schlafer had fired upon Aulicino because he was angry that she had cut him off in a traffic lane. At the conclusion of trial, the jury found Schlafer guilty of battery with the use of a deadly weapon. Thereafter, the district court sentenced Schlafer to ten years in the Nevada State Prison.

Schlafer now appeals, contending that his right to a fair trial was undermined by the State's failure to timely disclose the notes of one of the State's key witnesses.[1] Although we hold that the State had an affirmative duty to obtain and timely proffer to the defense the notes of the witness pursuant to a lawful court order, we conclude that in this case the State's untimely disclosure did not deprive Schlafer of a fair trial. Accordingly, for the reasons set forth below, we affirm Schlafer's conviction.

## FACTS

On the evening of January 13, 1994, Otto Krepkie (Krepkie) was working as a bouncer at Larry's Villa nightclub in Las Vegas. At one point during the evening, as he was ejecting an unruly patron from the premises, Krepkie heard several gunshots outside the club. While looking outside to see what had transpired, Krepkie saw a red Ford Explorer and a smaller red convertible stopped alongside each other at the intersection of Rancho Drive and Highway U.S. 95. Seconds later, the red convertible accelerated away from the intersection at a high rate of speed.

After the red convertible had departed the scene, Krepkie ran across the street to render assistance. By the time he reached the vehicle, a white Jeep Cherokee had arrived on the scene. A

---

[1]Schlafer raises numerous other issues in the instant appeal. First, Schlafer contends that several of the jury instructions were erroneous, and that the police failed to investigate other leads in the case and to preserve allegedly exculpatory evidence. Additionally, Schlafer contends that the district court erred in permitting the State to endorse an additional witness during trial, and that the district court erred in allowing during trial the testimony of various witnesses, including the victim. Finally, Schlafer contends that several remarks of the prosecutor constituted misconduct and that the evidence adduced at trial was insufficient to sustain his conviction. However, after oral argument and careful review of the record on appeal and the briefs filed herein, we conclude that Schlafer's additional assignments of error are without merit.

woman jumped out of the Jeep and began administering first aid to a woman in the red Explorer who had been shot in the head but was still alive. The woman also handed Krepkie her cellular telephone and told him to call 911. As Krepkie described the red convertible to the police, the woman who was administering first aid became emotional and exclaimed: "My god, I think I know who did it!"

When the police arrived approximately four minutes later, the victim was identified as Aulicino, and the woman who had been rendering first aid identified herself as Wendy Muir (Muir). Muir indicated that she and her boyfriend—appellant Schlafer—worked together as paramedics for Mercy Ambulance and that the description of the red convertible provided by Krepkie appeared to match the description of Schlafer's vehicle. Muir explained that she and Schlafer had been at a nearby bar and that Schlafer, who had consumed several beers, seemed depressed when Muir declined Schlafer's invitation to spend the night together. Muir then provided the police with Schlafer's name and address.

After arriving at the address that Muir had provided, Las Vegas Metropolitan Police Department (LVMPD) officers made a telephone call to the residence and instructed Schlafer to exit the house. Upon exiting, Schlafer was arrested and taken into custody.

Schlafer was charged with one count of attempted murder with the use of a deadly weapon and one count of battery with the use of a deadly weapon, to which he pleaded not guilty. A jury trial commenced on May 23, 1994, but on June 2, 1994, the district court declared a mistrial. A second jury trial commenced on June 5, 1995.

While incarcerated in the Clark County Detention Center awaiting trial, Schlafer shared a cell with Neil Wallach (Wallach). During their jailhouse conversations, Schlafer allegedly told Wallach that he had shot Aulicino out of anger because she had veered into his traffic lane thereby cutting him off. Wallach had purportedly taken notes of his conversations with Schlafer, and during Schlafer's first trial, Wallach testified on behalf of the State that Schlafer had admitted to shooting Aulicino out of anger instead of self-defense.

Prior to the start of the second trial, Schlafer requested the State's file on Wallach. Accordingly, the district court ordered the State to proffer Wallach's notes to the defense by March 30, 1995. However, by April 28, 1995, the State still had not proffered Wallach's notes to the defense. During a hearing on June 5, 1995, the State explained that it did not have Wallach's notes in its possession but that the State would contact Wallach to see if he still had the notes. The district court again ordered the State to proffer Wallach's notes to the defense by the following day.

The next day, June 6, 1995, the State failed to provide Wallach's notes to the defense as ordered by the district court. In fact, the State did not proffer the notes to the defense until June 7, 1995, the day Wallach testified at trial, claiming that it did not obtain the notes until the evening prior to Wallach's testimony.

During trial, the State called numerous witnesses. Aulicino testified that on the evening of January 13, 1994, she departed her boyfriend's home at approximately 11:30 p.m. The last thing Aulicino remembered about the evening was turning northbound on Rancho Drive en route to her home. Aulicino had no recollection of the shooting or of the events leading up to or immediately following the incident. Additionally, Aulicino testified that while her boyfriend had given her a handgun as a gift, she did not carry the weapon in her vehicle.

The State also called Mike Worthen (Worthen), Schlafer's roommate. Worthen testified that on the evening of the shooting, Schlafer arrived home at approximately 1:30 a.m. as Worthen was watching television in the living room. Worthen testified that Schlafer went straight to his bedroom, and after about ten minutes, emerged in his bathrobe. In conversation, Schlafer stated to Worthen that he had been involved in a traffic altercation because some "bitch" had cut him off. Worthen testified that shortly thereafter the police called and ordered him and Schlafer out of the house.

The State also called Wallach, Schlafer's former cellmate at the Clark County Jail. Wallach testified that Schlafer had told him that on the evening of January 13, 1994, a woman in a red Ford Explorer began tailgating him as he drove home on Rancho Drive. Angered, Schlafer took his foot off the gas and swerved to cut the woman off as she tried to pass him.

Schlafer indicated that eventually the woman was able to pass him, and in so doing, she flipped her middle finger at him. The two vehicles came to a stop at a red light, whereupon the woman powered down her right-side window, flipped her middle finger at him again, and then began to yell at him. At this point, Schlafer told Wallach that he grabbed his .380 caliber handgun and fired five or six shots at the woman because "she pissed him off." Schlafer further added that his only mistake was that he did not use a bigger gun.

During cross-examination, defense counsel repeatedly attacked Wallach's credibility and explored in great detail the circumstances of his prior conviction. Additionally, defense counsel revealed that in exchange for his testimony, Wallach had asked the State to draft a letter to the parole board indicating his favorable testimony against Schlafer. Finally, defense counsel attempted to impeach the veracity of Wallach's account of Schlafer's jailhouse

admission by indicating that all of the details of Wallach's testimony could have been gleaned from newspaper accounts of the shooting.

Schlafer also took the stand and advanced a theory of self-defense. Schlafer testified that after he and Muir had parted at the bar, he got into his red Chrysler LeBaron convertible and began making the drive home on Rancho Drive. While driving on Rancho Drive, a vehicle began to tailgate him, so he reduced his speed to allow the vehicle to pass. The other vehicle, which he now recognized as a red Ford Explorer, proceeded into the right lane and began matching his speed. At one point, the Explorer accelerated its rate of speed and swerved sharply in front of Schlafer's vehicle.

Schlafer testified that at this point, he became fearful of the occupants of the Explorer. At the intersection of Rancho Drive and U.S. 95, Schlafer had to stop for a red light adjacent to and on the right side of the Explorer. In glancing over at the Explorer, Schlafer noticed that the driver, a woman, was screaming profanities at him and making obscene gestures with her middle finger.

Schlafer testified that at some point during the encounter, the woman's hand dropped below his field of vision and then came back up, pointing at him. At this point, Schlafer grabbed his handgun, fired several shots in the direction of the driver, and then fled the scene. After Schlafer was arrested at his home, he informed the police that he had acted in self-defense.

Schlafer also called Stephanie Howe (Howe) as a witness. Howe was Aulicino's neighbor and alleged cocaine supplier. Howe testified that she and Aulicino had used cocaine together in the past, and that on the night prior to the shooting, Aulicino had stopped by her house and appeared to be high on cocaine. Howe testified that while she did not see Aulicino ingest cocaine on that evening, Aulicino had cocaine in her possession. Additionally, Craig Voss, M.D., who had been qualified as an expert in the field of pathology and urine test screening, testified that Aulicino's urine sample taken at the hospital on the night that she was shot tested positive for cocaine.

At the conclusion of trial, the jury found Schlafer not guilty of attempted murder, but guilty of battery with the use of a deadly weapon. Accordingly, on August 7, 1995, the district court sentenced Schlafer to ten years in the Nevada State Prison with 375 days credit for time served. Additionally, the district court assessed a $10,000.00 fine.

Schlafer now appeals.

## DISCUSSION

Schlafer contends that the State's failure to timely proffer

Wallach's notes of Schlafer's alleged jailhouse admission necessitates a new trial because the State's delay undermined his ability to effectively cross-examine Wallach. Although the State failed to timely comply with the district court's order directing it to proffer Wallach's notes to the defense, we conclude that the State's untimely admission in this instance did not deprive Schlafer of a fair trial.

Due process requires the State to disclose material evidence favorable to the defense. Brady v. Maryland, 373 U.S. 83, 87 (1963). In Nevada, a *Brady* violation occurring after the defense has made a specific request for evidence is material if " 'there exists a reasonable *possibility* that the claimed evidence would have affected the judgment of the trier of fact, and thus the outcome of the trial.' " Jimenez v. State, 112 Nev. 610, 619, 918 P.2d 687, 692 (1996) (quoting Roberts v. State, 110 Nev. 1121, 1132, 881 P.2d 1, 8 (1994)).

In the instant case, Schlafer made a specific request for Wallach's notes, and the State was ordered to provide them to the defense on several occasions, the first of which was approximately three months prior to the commencement of Schlafer's second trial. The State failed to comply with the district court's order to provide Wallach's notes at each juncture, and finally proffered Wallach's notes to the defense on the morning of Wallach's testimony at trial on June 7, 1995.

Although the quality of defense counsel's cross-examination of Wallach may have been enhanced by the State's timely admission of Wallach's notes, and even assuming that the notes constituted *Brady* material, we conclude that there is no reasonable possibility that the outcome of Schlafer's trial would have been affected if the State had timely proffered Wallach's notes as ordered.

As is evident from the record on appeal, defense counsel engaged in a blistering cross-examination of Wallach by repeatedly attacking his credibility, exploring in detail his prior conviction, exposing, as a motive for his testimony, his hope for favorable treatment from the parole board, and undermining the veracity of his account of Schlafer's jailhouse admission by revealing that most of Wallach's information was readily available in newspaper accounts of the shooting. Based on the scope and breadth of defense counsel's cross-examination of Wallach, we conclude that even if the State had made a timely admission of Wallach's notes, there is no reasonable possibility that the result of Schlafer's trial would have been different.

Notwithstanding our conclusion that the State's untimely

admission of Wallach's notes did not deprive Schlafer of a fair trial, we nonetheless conclude that the State failed to exercise due diligence in obtaining Wallach's notes as ordered by the district court. Although the State asserts that its conduct was proper pursuant to NRS 50.125[2] because it made Wallach's notes available to the defense on the day that Wallach testified at trial, our inquiry does not end there.

■■■■■■■■

The fact remains that the State repeatedly violated the district court's lawful discovery orders.[3] The State's assertion that it could not produce Wallach's notes sooner because it did not obtain them until the evening prior to Wallach's testimony begs the question as to whether the State had an affirmative duty to comply with repeated court orders directing it to acquire and proffer Wallach's notes. Irrespective of any heightened ethical obligation, the district court repeatedly ordered the State in this case to proffer Wallach's notes to the defense. It was incumbent upon the State to either comply with the district court's orders, or demonstrate—immediately upon discerning that its ability to comply with the district court's order would be problematic—why it could not proffer Wallach's notes in a timely fashion. By disregarding the district court's orders, and by failing to even inform the district court that compliance with its orders to produce Wallach's notes would be problematic, the State's conduct in this matter fell far short of its professional obligations.

■■■■■■■■

We take as true the State's assertion that it did not have

---

[2]In relevant part, NRS 50.125 provides:

    1.  If a witness uses a writing to refresh his memory, either before or while testifying, an adverse party is entitled:
    (a) To have it produced at the hearing;
    (b) To inspect it;
    (c) To cross-examine the witness thereon; and
    (d) To introduce in evidence those portions which relate to the testimony of the witness for the purpose of affecting his credibility.

    . . . .

    3.  If a writing is not produced or delivered pursuant to order under this section, the judge shall make any order which justice requires, except that in criminal cases when the state elects not to comply, the order shall be one:
    (a) Striking the testimony; or
    (b) If the judge in his discretion determines that the interests of justice so require, declaring a mistrial.

[3]We take this opportunity to remind prosecutors that the willful failure to comply with discovery obligations and district court orders pertaining thereto may constitute professional misconduct. *See* SCR 173(3)-(4).

Wallach's notes in its possession until the night prior to Wallach's testimony, and thus we assume that the State's failure to timely proffer Wallach's notes was the result of negligence and not bad faith. However, we will not countenance similar conduct in future cases. Accordingly, we hold that the State must exercise due diligence to obtain any written or recorded statement that the district court has ordered to be produced and to provide such material to the defense as ordered. In future cases, the State's failure to comply with similar court orders may result in a presumption that the State has acted in bad faith to prejudice a criminal defendant.

## CONCLUSION

We conclude that the State's untimely admission of Wallach's notes did not deprive Schlafer of a fair trial. In future cases the State must exercise due diligence by timely complying with court orders directing it to obtain and proffer to the defense any written or recorded statement of a witness that the State intends to call during its case-in-chief.

